IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KARLA ANN FILM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 14-cv-574-TLW |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Karla Ann Film seeks judicial review of the decision of the Commissioner of the Social Security Administration denying her claims for supplemental security income under the Social Security Act ("SSA"), 42 U.S.C. § 1382c(a)(3). In accordance with 28 U.S.C. § 636(c)(1) & (3), the parties have consented to proceed before a United States Magistrate Judge. (Dkt. 11). Any appeal of this decision will be directly to the Tenth Circuit Court of Appeals.

## ISSUES

On appeal, plaintiff raises two issues: (1) that the ALJ erred in failing "to provide specific, legitimate reasons to reject the opinions expressed by the consultative examiner," and (2) that the ALJ erred by "denying benefits based on mere speculation" that plaintiff "may improve in the future with treatment, instead of considering her present condition to evaluate her disability." However, a close reading of plaintiff's arguments reveals that together they are a

challenge to the ALJ's handling of the consultative examiner's opinion in relation to her residual functional capacity ("RFC"); therefore, the Court will discuss and dispose of them together.[1]

## STANDARD OF REVIEW

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 50-year old female, applied for Title XVI benefits on April 13, 2011. (R. 102-106). Plaintiff initially alleged a disability onset date of August 31, 2009. (R. 102). Plaintiff claimed that she was unable to work due to neck pain, fibromyalgia, arthritis, "neck pain from degenerative disc disease," "arthritis pain in ankles, neck, shoulder, [and] right hand," and "fatigue [and] weakness from fibromyalgia [and] depression." (R. 119).

---

[1] Plaintiff couches her first allegation of error as a failure of the ALJ to weigh Dr. Snider's opinion; however, the Court finds that the ALJ did weigh the opinion, and construes plaintiff's argument as a challenge to the ALJ's handling of Dr. Snider's opinion in relation to the RFC.

Plaintiff's claims for benefits were denied initially on October 19, 2011, and on reconsideration on February 27, 2012. (R. 79, 87-90; 82, 94-96). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on January 14, 2013. (R. 61-78). During the hearing, plaintiff amended her alleged onset date to her April 13, 2011 application date. (R. 64). The ALJ issued a decision on February 7, 2013, denying benefits and finding plaintiff not disabled because she was able to perform other work. (R. 6-19). The Appeals Council denied review, and plaintiff appealed. (R. 1-4; dkt. 2).

**The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since her application date of April 13, 2011. (R. 11). Plaintiff had the severe impairments of "neck pain (degenerative disc disease), history of left foot surgery, fibromyalgia, depression and anxiety." Id. The ALJ found plaintiff's right hand injury and history of alcohol abuse were nonsevere. Id.

Plaintiff did not have an impairment or combination of impairments that met or equaled a Listing. (R. 11-12). The ALJ placed specific emphasis on "Listing Section 1.00, et seq., Musculoskeletal and Listing Section 12.00, et seq., Mental." (R. 12). The ALJ narrowed his focus on the Mental Listing Section to Listings 12.04 and 12.06. He analyzed the "paragraph B" criteria to determine that plaintiff has a moderate restriction in the areas of activities of daily living; social functioning; and concentration, persistence, or pace; and that she experienced "one to two episodes of decompensation, each of extended duration." Id.

After reviewing plaintiff's testimony, the medical evidence, and other evidence in the record, the ALJ concluded that plaintiff retained the RFC to

> perform light work as defined in 20 CFR 416.967(b), that is, occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand/walk at least six hours out of an eight-hour workday; and sit at least six hours out of an eight-hour workday, all with normal breaks. However, she should avoid work above

>shoulder level. In regards to mental limitations, she could do simple, repetitive tasks, relate to supervisors and co-workers only superficially, and not work with the general public.

(R. 13).

Plaintiff had no past relevant work. (R. 17). The ALJ found that plaintiff was 50 years old, "which is defined as an individual closely approaching advanced age," on her application date, that she had at least a high school education, and that transferability of job skills was not an issue because she did not have past relevant work. (R. 17-18). Considering the testimony of a vocational expert at the hearing, plaintiff's age, education, work experience, and RFC, the ALJ made the step five finding that plaintiff was capable of performing the requirements of the occupations of bakery worker (DOT # 525.687-022), and small production assembler (DOT # 706.684-022). (R. 18).

Accordingly, the ALJ concluded that plaintiff was not disabled. Id.

**Medical Evidence**

Plaintiff does not challenge any issues relating to her physical limitations, only her mental limitations. (Dkt. 18). Plaintiff alleges errors with the ALJ's evaluation of psychological consultative examiner Brian R. Snider, Ph.D.'s opinion, and faults the ALJ for "denying benefits based on mere speculation that [plaintiff] may improve in the future with treatment… ." (Dkt. 18 at 2.) Accordingly, the undersigned will limit the discussion of the medical records to those related to plaintiff's mental health.

Plaintiff does not have a mental health provider. According to the record, she was a patient at OU Clinic from May 2010 to March 2012, where she was treated mainly for a variety of physical problems. Anxiety and depression were incidental diagnoses, her complaints were mild, and she was prescribed medication to treat these issues. (R. 237, 239, 243, 245, 247, 249,

4

251, 253, 254, 264, 269, 397, 400, 401, 404-05, 411-13, 416, 418-19, 424, 427, 434, 446, 448, 452, 454, 458, 462, 465). She was not referred to any therapy services offered by OU. During several visits, plaintiff admitted finding "good relief from [her] medications," and the majority of her objective psychological evaluations during this time revealed that she was alert and cooperative with a normal mood and affect, a normal attention span, and normal concentration. Id.

Specifically, in September, 2011, plaintiff presented two times to OU Clinic-once on September 7 with complaints of neck pain and insomnia, and again on September 28 with complaints of depression and insomnia. (R. 410, 416). These visits were immediately prior to her consultative evaluation with Dr. Snider on October 3, 2011. During both September visits, plaintiff's "physical exam" showed under "Psych:" that she was "[a]lert and cooperative; [with] normal mood and affect; normal attention span and concentration." (R. 413, 418). Her medications were adjusted on the September 28 visit. (R. 419). By her October 5, 2011 visit, although she "express[ed] concern over panic attacks," plaintiff's subjective psychiatric report shows that she "denie[d] nervous, sleep problem, stress, troubling thoughts and feeling sad/blue." (R. 424). Effexor was added to her medications. (R. 425). Plaintiff indicated that her physical functioning, family and social relationships, mood and sleep patterns, and overall functioning were all "better" at this visit. (R. 427).

Plaintiff again presented to OU Clinic November 30, 2011 complaining of chronic neck pain, and for medication refills. (R. 434). Her anxiety was noted as "controlled with ativan, no SI/HI or SA, symptoms stable." Id. Plaintiff presented again on December 19, 2011, complaining of right shoulder and neck pain. (R. 440). She was noted to be "alert and cooperative" with "normal mood and affect; normal attention span and concentration." (R. 442).

Plaintiff again visited OU Clinic on December 28, 2011 for neck pain and degenerative joint disease. (R. 445). Under "history of present illness," the intake provider noted that plaintiff was there to refill her pain medication, and that she indicated she "has 'degenerative disc disease'"; plaintiff also indicated that she "need[ed] ativan for anxiety; [patient] does not see psych and only gets treated here for anxiety; need refill on meds today." (R. 446). Plaintiff indicated no problems with any psychiatric symptoms. (R. 447). Her psychiatric examination showed a normal mood, affect, attention span, and concentration level; and plaintiff was alert and cooperative. (R. 448). Dr. John Carment, M.D. noted that plaintiff was "doing well with her anxiety," refilled her prescription for Ativan and removed Effexor from her medication list. Id.

On January 25, 2012, plaintiff again presented for medication refills of Percocet and Ativan. (R. 450). Plaintiff admitted receiving hydrocodone from a dentist after having a tooth pulled. Id. The attending physician discussed the "Opoid [sic] contract" that plaintiff signed on July 13, 2011 which stated that she could only obtain opioid medications from OU Clinic. (R. 452). Dr. Jelley sent plaintiff for a urine drug screen to determine if she was in further violation of the contract. Id.

Plaintiff returned to OU Clinic on February 22, 2012 for a pain management visit. (R. 459). Dr. Benjamin Getter, plaintiff's primary physician at OU, noted that plaintiff was "doing well on [her] current [anxiety] regimen," and that she "[h]as really stabilized in life and excised demons." (R. 462). He refilled her medications. Id. Plaintiff's lab results confirmed a positive urine drug screen. (R. 456-458). On February 27, 2012, Drs. Getter and Yarborough discussed the results and agreed to dismiss plaintiff from OU Clinic. (R. 458).

Plaintiff presented to OU Clinic on March 19, 2012 for what turned out to be her final visit. (R. 464-68). Dr. Getter discussed plaintiff's pain and positive urine drug screen at length.

6

Plaintiff admitted to Dr. Getter that she was filling prescriptions "from someone other than OU," but denied using methamphetamine. (R. 465). Plaintiff claimed that "she was in a poor living situation where stuff may have been laced with methamphetamine." Id. Dr. Getter filled a prescription for Ativan for plaintiff's anxiety, but advised her to "taper if dismissed and unable to find [a] new PCP." (R. 466).

Plaintiff's next medical record is an emergency room visit to Claremore Indian Hospital on March 28, 2012 with complaints of fatigue, heartburn, nausea, vomiting, muscle, and joint pain. (R. 469-73). Her past relevant medical history revealed that she was receiving care for chronic pain management until that "was discontinued due to 'dirty urine' ie. (+) for amphetamines." (R. 470). Plaintiff denied using methamphetamine, but then admitted that "she in the past has 'taken everything in the books' and that her last meth use was [three] weeks ago." Id. Plaintiff admitted a history of alcohol abuse, but claimed she has been "dry for years." Id. Plaintiff was diagnosed with vomiting, hypokalemia, and a positive urine drug screen, treated with IV fluids and potassium, and discharged home. (R. 472-73). The drug screen tested positive for amphetamines, methamphetamines, opiates, and "TCC's." (R. 473).

**Agency Physicians**

<u>Consultative Examination</u>

On October 3, 2011, plaintiff visited Dr. Snider for a mental consultative examination. (R. 276-280). Dr. Snider did not review plaintiff's medical records, noting that plaintiff was "the informant for the exam and appears to be a poor historian." (R. 276). Dr. Snider summarized plaintiff's subjective complaints, noting that she claimed that "she was admitted to the Tulsa Center for Behavioral Health in 2008 for suicidal thoughts." Id. Plaintiff told Dr. Snider that she

was taking amitriptyline prescribed by an OU Clinic physician, and "that she has never taken any other psychiatric medications." Id. She reported no other psychiatric care.

Dr. Snider recited that plaintiff "felt depressed constantly her entire life," "complain[ed] of a lack of interest in pleasurable activities, insomnia, fatigue, difficulty thinking clearly, difficulty making decisions, problems concentrating, feelings of worthlessness, hopelessness, and excessive guilt." Id. Plaintiff further informed Dr. Snider that she suffered "episodes of acute anxiety during which she has a racing heart, shaking, difficulty breathing, nausea, dizziness, numbness, tingling, chills, and hot flushes," and claimed to have these "episodes daily since she was a child," and "indicate[d] that she avoids crowds due to fear of having a panic attack." (R. 276-77).

Plaintiff indicated that she was a victim of "severe domestic violence in the past," and continues to have "intrusive thoughts about the trauma and occasional nightmares." (R. 277). She told Dr. Snider that she avoids all reminders or triggers associated with the trauma. Id. She "report[ed] feeling detached and estranged from others," and "complain[ed] of a sense of the foreshortened future, hypervigilance, and an exaggerated startle response." Id. She further indicated that from 2003 to 2008, she routinely drank twelve to eighteen beers each day before attending alcohol rehabilitation in 2008 and again in 2009. Id. She admitted relapsing five weeks before her appointment, but claimed that she had "not drank in the past two weeks." Id.

Plaintiff reported four marriages and four divorces, and three children aged 15, 18, and 34. Id. She left high school after the 11th grade, and told Dr. Snider that she had "been arrested 47 times, mainly on alcohol-related charges, and was in prison twice in the 1990s for DUIs." Id.

Plaintiff reported that in a "normal day," she takes a walk, "goes to church 4 to 5 times a week, reads, and watches television." Id. She claimed to have "difficulty completing chores due

8

to physical pain," and indicated that she shops at night to avoid crowds. Id. Plaintiff stated that she does not drive, and "stays socially isolated." Id.

Dr. Snider's mental status examination revealed relatively mild findings. (R. 277-78). Dr. Snider found plaintiff's thought content "logical and coherent," and her "reality testing appeared to be intact." (R. 277). Plaintiff received 27 points of a possible 30 on the Mini-Mental Status Exam. (R. 278). Dr. Snider stated that plaintiff's IQ "appear[ed] to be in the low-average range," and her "insight and judgment regarding common situations and every day concerns appear[ed] to be adequate. During this exam, she appeared to have mild difficulty with memory and concentration." Id.

Dr. Snider then theorized that plaintiff

> would probably have mild difficulty understanding and carrying out simple instructions and would likely have moderate to marked [sic] with complex and detailed instructions. She is likely to have marked to extreme difficulty concentrating and persisting through a normal work day due to psychiatric symptoms. Her ability to maintain a normal workday and work week without interruptions from her psychiatric symptoms is likely markedly to extremely impaired. In all likelihood, she would have marked to extreme difficulty responding appropriately to coworkers, supervisors, and the public. Ms. Film appears capable of managing her own funds responsibly.

(R. 278-79).[2] Dr. Snider diagnosed "Major Depressive Disorder, Single Episode-Mild to Moderate, Chronic; Panic Disorder with Agoraphobia; Posttraumatic Stress Disorder; [and] Alcohol Dependence." (R. 279).

Dr. Snider recommended that plaintiff seek outpatient psychiatric care "from a community health center including medication, psychotherapy, substance abuse services, and

---

[2] Dr. Snider does not explain the basis for the extreme limitations found in this opinion, and the opinion is in direct contrast with his relatively mild objective findings. (R. 277-78).

case management." Id. Dr. Snider opined that with "appropriate and consistent psychiatric care," plaintiff would "experience significant improvement" in her symptoms. Id.

Non-Examining Agency Physicians

Cynthia Kampschaefer, Psy.D. reviewed plaintiff's entire medical record, including Dr. Snider's consultative examination, and completed a Psychiatric Review Technique form ("PRT"), a Mental Residual Functional Capacity form (MRFC), and a Medical Evaluation/Case Analysis, each dated October 11, 2011. (R. 282-85, 286, 287-300). In the PRT, Dr. Kampschaefer found that plaintiff had moderate difficulty in activities of daily living; maintaining social functioning; concentration, persistence, or pace; and that she experienced one to two episodes of decompensation. (R. 297). She summarized plaintiff's records, and her claims to Dr. Snider, then pointed out that although plaintiff claimed to only have one psychiatric prescription, records from Indian Health Resource Center revealed a diagnosis of anxiety in 2009 and prescriptions of Ativan and Elavil. (R. 299). Dr. Kampschaefer noted that plaintiff was also prescribed Cymbalta. Id. Dr. Kampschaefer specifically stated "[a]lthough CE dr says [plaintiff] cannot deal with the workplace, the MSE [Mental Status Examination] contradicts this. It appears she can do simple tasks when she is sober."[3] Id.

Dr. Kampschaefer found that plaintiff was markedly limited in her ability to understand, remember, and carry out detailed instructions, and markedly limited in her ability to interact appropriately with the general public. (R. 282-83). Plaintiff was rated "not significantly limited" in all other functional areas. Id. Dr. Kampschaefer opined that plaintiff "can perform simple tasks with routine supervision, … relate to supervisors and peers on a superficial work basis, …

---

[3] Dr. Kampschaefer further notes on her Case Analysis form that the "CE is internally inconsistent. The claimant's mse appears very good so we cannot go along with the statements that claimant cannot work." (R. 286).

[and] adapt to a work situation, [but] cannot relate to the general public." (R. 284). These are the limitations adopted by the ALJ in his decision. (R. 13). On February 27, 2012, Sally Varghese, M.D. reviewed plaintiff's updated medical records and affirmed Dr. Kampschaefer's October 11, 2011 assessments. (R. 374).

## ANALYSIS

### Dr. Snider's Opinion

Plaintiff relies on Chapo v. Astrue, 682 F.3d 1285, 1291 (10th Cir. 2012), to support her arguments that "despite the ALJ's assertion that he gave 'considerable weight' to the opinion of Dr. Snider," he improperly engaged in picking and choosing those portions of Dr. Snider's opinion "favorable to a finding of nondisability" and "failed to give 'specific legitimate reasons' for rejecting" portions of Dr. Snider's opinion. (Dkt. 18). Plaintiff further argues that the ALJ erred by then relying on Dr. Snider's opinion that "with appropriate and consistent psychiatric care, [plaintiff] should expect to experience significant improvement" in her symptoms. Id.

The Commissioner argues, however, that the ALJ appropriately afforded Dr. Snider's opinion "considerable weight" because other medical evidence in the record contradicts his restrictive opinions, and in fact supports Dr. Snider's opinion that if plaintiff sought consistent treatment, her condition would improve. (Dkt. 19).

The Court notes that the mental RFC findings in Chapo are decidedly different from the instant case. The mental health opinion in question in Chapo was not internally inconsistent, or opposed by any other source. Chapo, 682 F.3d at 1291. Dr. Snider's opinion does not enjoy the same status here. Not only is Dr. Snider's opinion internally inconsistent with his mild objective examination findings, his opinion is in direct conflict with treatment records discussed by the ALJ from OU Clinic, which show marked improvement in plaintiff's mental health with simple

medication adjustments in a short period of time, even though plaintiff did not follow all of Dr. Snider's treatment recommendations. See (R. 15-17, 434, 446, 448, 462).

On October 11, 2011, Dr. Cynthia Kampschaefer, Psy.D. completed a mental PRT form and a mental RFC form regarding plaintiff, taking the entire record into account, including Dr. Snider's consultative examination. (R. 282-86, 287-300). Dr. Kampschaefer found marked limitation in plaintiff's ability to remember, understand, and carry out detailed instructions, and interact appropriately with the general public. (R. 282-83). She opined that plaintiff could "perform simple tasks with routine supervision," "relate to supervisors and peers on a superficial work basis," "adapt to a work situation," but she "cannot relate to the general public." (R. 284).

The ALJ adopted Dr. Kampschaefer's mental RFC findings directly into plaintiff's RFC, stating that with "regards to [plaintiff's] mental limitations, she could do simple, repetitive tasks, relate to supervisors and co-workers only superficially, and not work with the general public." (R. 13). The ALJ went on to discuss Dr. Snider's examination, conflicting evidence from OU Clinic, Claremore Indian Hospital, and the agency physicians. (R. 13-17). The ALJ gave "great weight" to records from OU Clinic showing significant improvement with only medication, no psychiatric therapy, and noted that plaintiff was dismissed from treatment at OU Clinic for drug seeking behaviors. (R. 17).

Contrary to plaintiff's implied argument that the ALJ is required to rely on one medical opinion to formulate a claimant's RFC, the ALJ was not bound to structure plaintiff's RFC based directly on Dr. Snider's opinion. Chapo, 682 F.3d at 1288. ("[T]here is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question.").

The ALJ listed a summation of his RFC weight, in which he clearly delineates the order of intended RFC weight (both physical and mental): "In sum, the above residual functional capacity assessment is supported by State agency, Claremore Indian Hospital, Dr. Drake, Dr. Salguero, OU Internal Medicine Clinic, Dr. Snider, and Tulsa Urban Center, as indicated above." (R. 17). This fact, coupled with the ALJ's previous assignment of "great weight" to the records from OU Internal Medicine, tells the Court that the ALJ relied primarily on evidence from plaintiff's treating sources and the state agency physicians to formulate plaintiff's mental RFC. The Court is able to follow the ALJ's reasoning. Remanding this case for the ALJ to state that he gave more weight to the state agency mental RFC opinion would not change the outcome because that is clearly what he did. See Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (remand was unnecessary when minor technical errors did not undermine confidence in the determination of the case).

## CONCLUSION

For the foregoing reasons, the ALJ's decision denying plaintiff's claims for benefits is AFFIRMED.

SO ORDERED this 7th day of March, 2016.

_____
T. Lane Wilson
United States Magistrate Judge

13